UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 20-cr-560 |
| | ) | |
| MELISSA TURASKY. | ) | Hon. Steven C. Seeger |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Melissa Turasky owned Gifford's Bar and Restaurant in the Chicagoland suburbs. At the outset of the COVID-19 pandemic, she applied for and received a $176,822 federally guaranteed loan on behalf of her business under the Paycheck Protection Program. That application required her to make certifications about her business.

A grand jury later returned a two-count indictment for bank fraud and for making a false statement to a financial institution. The thrust of the indictment is that Turasky misrepresented the status of her business and the anticipated use of funds. According to the indictment, Turasky certified that she would use the funds to pay for ongoing operations when, in reality, the business was already out of business.

Turasky, in turn, moved to dismiss the indictment. For the reasons stated below, the motion to dismiss is denied.

**Background**

Defendant Melissa Turasky owned Gifford's Bar and Restaurant in Elgin, Illinois. In March 2020, just before the COVID-19 pandemic sent the country into lockdown, Gifford's was on its last legs. According to the indictment, at the beginning of the month, Gifford's was evicted from its rental space and had vacated the property. *See* Indictment, at 1 (Dckt. No. 1). And by the end of the month, Gifford's had terminated all of its employees. *Id.*

In the meantime, COVID-19 was turning the country inside out and upside down, from coast to coast. On March 27, 2020, in response to the pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

The CARES Act created the Paycheck Protection Program ("PPP"), a multi-billion-dollar loan forgiveness program "designed to assist small businesses negatively impacted by the COVID-19 Pandemic." *ExWorks Cap., LLC v. Abrahams*, 2021 WL 1734362, at *1 (N.D. Ill. 2021). Under the program, "many small businesses became eligible for low-interest loans that would be guaranteed by the federal government and even eligible for forgiveness if the businesses used them, in essence, to keep employees on the payroll during the economic downturn." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 629 (7th Cir. 2021).

Congress created the PPP within the existing statutory framework of the Small Business Administration's 7(a) loan program. *See* 15 U.S.C. § 636(a)(36). SBA loans can come in a number of different forms. One type of loan is a "guaranteed loan . . . by which [the] SBA guarantees a portion of a loan made by a [participating] [l]ender." *See* 13 C.F.R. § 120.2(a).

To obtain that type of loan, a business needed to apply to participating private lenders. *See* 15 U.S.C. § 636(a)(36)(G). Private lenders would then process the loan applications and issue PPP funds to approved recipients. *See United States v. Crowther*, 2021 WL 50481, at *2 (M.D. Fla. 2021).

Borrowers could use PPP funds only for certain permissible expenses, including "payroll costs," "costs related to the continuation of group health care benefits," "employee salaries, commissions, or similar compensation," "payments of interest on any mortgage obligation,"

2

"rent," "utilities," "interest on any other debt obligations," and so on. *See* 15 U.S.C. § 636(a)(36)(F)(i). The money was designed to help keep businesses afloat, not their owners.

Applicants needed to make several good-faith certifications in their PPP applications. The certifications included the reason for the loan, and the anticipated use of the funds. Specifically:

> An eligible recipient applying for a covered loan shall make a good faith certification –
>
> (I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;
>
> (II) acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;
>
> (III) that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and
>
> (IV) during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan.

*Id.* at § 636(a)(36)(G)(i).

A few of the requirements loom large in the case at hand. The loan must be necessary for the "ongoing operations" of the business. *Id.* And the funds must be "used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments." *Id.*

Applicants also needed to provide the "average total monthly payments by the applicant for payroll costs incurred during the 1-year period before the date on which the loan is made," which the lender uses to determine eligibility for the loan and the loan amount. *See id.* at § 636(a)(36)(E)(i)(I)(aa)(AA); *see also* Def.'s PPP Borrower Application Form (Dckt. No. 27-4).

3

Finally, applicants had to "certify that the information provided in [the] application and the information provided in all supporting documents and forms [was] true and accurate in all material respects." *See* Def.'s PPP Borrower Application Form, at 2 (Dckt. No. 27-4). Applicants needed to acknowledge that "knowingly making a false statement to obtain a guaranteed loan from SBA [was] punishable under the law." *Id.*

According to the indictment, Turasky applied for a PPP loan on behalf of Gifford's on April 10, 2020, more than a month *after* the restaurant had been evicted. *See* Indictment, at 3 (Dckt. No. 1). Turasky made a number of certifications in her application form. She did so by placing her initials on various spots on the form, and filling in some blanks. *See* Def.'s PPP Borrower Application Form (Dckt. No. 27-4).

First, Turasky represented that the PPP loan was necessary to support the "ongoing operations" of the business. *See* Indictment, at 4 (Dckt. No. 1); *see also* Def.'s PPP Borrower Application Form, at 2 (Dckt. No. 27-4). Second, she certified that the loan would be "used to retain workers, maintain payroll, or make mortgage interest, lease, and utility payments." *See* Indictment, at 4; *see also* Def.'s PPP Borrower Application Form, at 2. Third, Turasky provided payroll and business expense figures and certified that they were true and accurate in all material respects. *See* Indictment, at 4; *see also* Def.'s PPP Borrower Application Form, at 1 (listing average monthly payroll as $70,729); *id.* at 2.

Gifford's application was successful. The business ultimately received $176,822 from a private lender. *See* Indictment, at 4 (Dckt. No. 1). The lender disbursed the PPP loan on May 1, 2020, into a bank account under the company's name, of which Turasky was a signatory. *Id.* at 4–5.

On August 7, 2020, a grand jury returned a two-count indictment charging Turasky with bank fraud, in violation of 18 U.S.C. § 1344 (Count I), and making a false statement to a financial institution, in violation of 18 U.S.C. § 1014 (Count II). *Id.* at 5–6.

The indictment alleges that Turasky made a number of misrepresentations in her application. Basically, Turasky represented that the restaurant was a going concern. She made it "appear that Gifford's was still open and operating." *Id.* at 4. But in reality, "[a]s of in or around early March 2020, Gifford's was no longer operational." *Id.* at 1. Gifford's had closed and had terminated all employees, and had no "ongoing operations." *Id.* at 4.

Turasky also certified that the loan would be used to retain workers, maintain payroll, or make mortgage interest, lease, and utility payments. But in reality, she knew that "Gifford's had been evicted from its restaurant space, all Gifford's employees had been terminated, and Gifford's would not use the PPP funds for these expenses." *Id.*

According to the indictment, Turasky fraudulently provided payroll and business expense figures, "to make it falsely appear that Gifford's continued to have payroll and business operating expenses." *Id.* And instead of using the funds as promised, Turasky used some of the funds "to make payments on a credit card in her name." *Id.* at 5.

Turasky now moves to dismiss, challenging the sufficiency of the indictment for failure to state an offense pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). *See* Mtn. to Dismiss Indictment (Dckt. No. 27).

**Legal Standard**

The Federal Rules of Criminal Procedure allow a defendant to make a pretrial motion challenging the sufficiency of the indictment by arguing that it fails to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v); *United States v. Boender*, 691 F. Supp. 2d 833, 837 (N.D. Ill. 2010).

"Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (quotation marks omitted). Rather, "it is a means to allege a defect in the indictment," which must meet minimum constitutional standards. *United States v. Yihao Pu*, 15 F. Supp. 3d 846, 849 (N.D. Ill. 2014) (citing Fed. R. Crim. P. 12(b)(3)(B)).

Meeting those minimum constitutional standards "is not a high hurdle." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *see also United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." *See* Fed. R. Crim. P. 7(c)(1). An indictment satisfies that standard if it: (1) states the elements of the crimes charged, (2) adequately informs the defendant of the nature of the charges brought against her, and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *See United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013) (citing *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000)); *see also* Fed. R. Crim. P. 7(c)(1).

"To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that [she] suffered prejudice from the alleged deficiency." *Vaughn*, 722 F.3d at 925; *see also United States v. Castaldi*, 547 F.3d 699, 703 (7th Cir. 2008). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Vaughn*, 722 F.3d at 925.

"An indictment is reviewed on its face, regardless of the strength or weakness of the government's case." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (citing *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988)). An indictment "that tracks the words of a

6

statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *Id.* at 958–59 (quotation marks omitted). "[I]indictments need not exhaustively recount the facts surrounding a crime's commission." *United States v. Firtash*, 392 F. Supp. 3d 872, 882 (N.D. Ill. 2019) (quoting *United States v. Agostino*, 132 F.3d, 1183, 1189 (7th Cir. 1997)).

When considering a challenge to the sufficiency of indictments, the court must "review indictments 'on a practical basis and in their entirety, rather than in a hypertechnical manner.'" *United States v. Stelmachowski*, 2018 WL 828078, at *2 (N.D. Ill. 2018) (quoting *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008)). The court also must accept all allegations as true and in the light most favorable to the government. *See Moore*, 563 F.3d at 586; *United States v. Clark*, 728 F.3d 622, 623 (7th Cir. 2013).

## Analysis

Turasky argues that the Court should dismiss the indictment because (1) "it was not illegal" to apply for a PPP loan when a business was "temporarily down" but "in operation," and (2) no false statements were made on the loan application. *See* Mtn. to Dismiss Indictment, at 3, 6 (Dckt. No. 27).

By and large, the motion suffers from two overarching problems.

First, the indictment is not about whether Turasky's business was eligible for a PPP loan on February 15, 2020, meaning the start date for eligibility. Instead, the indictment is about the truthfulness of the statements that Turasky made about her business when she applied for a loan on April 10, 2020.

7

Second, the motion at times seems to challenge the strength of the government's evidence. An indictment, however, does not depend on "whether the government can ultimately prove its case." *White*, 610 F.3d at 959. The Court only "look[s] to see if an offense is sufficiently charged." *Id.* And here, the indictment passes that test.

**I.      Bank Fraud (Count I)**

Count I charges Turasky with bank fraud in violation of 18 U.S.C. § 1344. The statute provides that a defendant commits bank fraud if she:

knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344; *see also United States v. O'Brien*, 953 F.3d 449, 458 (7th Cir. 2020).

A conviction under the statute requires the government to prove the following elements: (1) there was a scheme to defraud a bank; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) at the time of the charged offense the entity was insured by the Federal Deposit Insurance Corporation. *See United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citing *United States v. Freed*, 921 F.3d 716, 722 (7th Cir. 2019)); *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020).

Count I of the indictment "tracks the language of the statute, and lists each element of the crime." *White*, 610 F.3d at 959. It alleges that Turasky executed a scheme to defraud Bank A, a financial institution insured by the FDIC, by applying for $176,822 in PPP funds by making

materially false and fraudulent pretenses, representations, and promises in her application. *See* Indictment, at 3 (Dckt. No. 1).

The indictment identifies a number of alleged fraudulent misrepresentations.

In particular, Turasky represented that the PPP loan was necessary to support the "ongoing operations" of the business, despite knowing that Gifford's was out of business. *Id.* at 4. Turasky also represented that the loan would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," when she knew that the restaurant had been evicted, had fired all its employees, and would not use the PPP funds for these expenses. *Id.*[1]

Turasky argues that the indictment fails to allege that she acted with intent to defraud the bank. *See* Motion to Dismiss Indictment, at 6 (Dckt. No. 27) ("The indictment never alleges that Defendant planned to use the funds for impermissible purposes. The element of fraudulent intent is simply assumed because Giffords [sic] was closed at the time of the application."). Not so.

---

[1] In addition, the indictment includes another alleged misrepresentation. The indictment alleges that Turasky fraudulently provided monthly payroll figures and other business expenses "to make it falsely appear that Gifford's continued to have payroll and business operating expenses." *See* Indictment, at 4 (Dckt. No. 1). The application form required Turasky to give the "Average Monthly Payroll," and she wrote "$70,729." *See* Def.'s PPP Borrower Application Form, at 1 (Dckt. No. 27-4). But under the statute, that figure is a historical figure, not a prospective figure. That is, the statute requires applicants to summarize their payroll in the *prior* 12 months, not the *future* 12 months. *See* 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA) (requiring applicants to provide the "average total monthly payments by the applicant for payroll costs incurred during the 1-year period *before* the date on which the loan is made") (emphasis added). In fact, the application form itself cements the point. The instructions on page three explain how to state the "Average Monthly Payroll." And the instructions say that applicants should look to *2019*. "For purposes of calculating 'Average Monthly Payroll,' most Applicants will use the average monthly payroll for 2019 . . . ." *See* Def.'s PPP Borrower Application Form, at 3 (Dckt. No. 27-4). The indictment does not appear to allege that Turasky misrepresented her company's *historical* payroll expenses. Instead, the indictment alleges that she misrepresented the future payroll expenses. But that's not what the statute required, and that's not what the form required, either. Overall, this Court concludes that the indictment is sufficient, even without the allegation about the payroll expenses. The Court will reserve for a later day whether the statement in the form about "Average Monthly Payroll" could give rise to a conviction on the facts at hand.

"An indictment need not say much to be deemed sufficient." *Moore*, 563 F.3d at 585. Its allegations need only "track[] the words" of the statute such that there are enough factual allegations to make the defendant aware of the specific conduct at issue. *See Vaughn*, 722 F.3d at 925 (quotation marks omitted). In the context of this case, the Court only must "decide whether it's possible to view the conduct alleged" as demonstrating an intent to defraud. *See Moore*, 563 F.3d at 585; *see also United States v. Hausman*, 345 F.3d 952, 955 (7th Cir. 2003) ("The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.").

Here, although the indictment does not use the magic word "intent," it nonetheless "provides corroborating circumstances" of Turasky's intent to defraud. *White*, 610 F.3d at 959. For example, it alleges that Turasky impermissibly used PPP funds to make payments on a credit card in her name – behavior that is consistent with an intent to defraud. *See* Indictment, at 5 (Dckt. No. 1). It also explicitly alleges that Turasky's misrepresentations were "done in furtherance of the scheme." *Id.* And more generally, knowledge of the demise of the business could give rise to an inference of fraudulent intent.

At this point, when evaluating the indictment, this Court must accept the allegations as true. Time will tell. In the meantime, the indictment adequately alleges that Turasky intentionally made misrepresentations when she applied for the funds.

Next, Turasky argues that Count I is insufficient because Gifford's was technically eligible for a loan under the CARES Act, despite being non-operational at the time of her application. As Turasky sees it, the business was running on February 15, 2020, the required date of operation under the Act. What's more, bankrupt businesses are eligible for PPP loans.

Therefore, in her view, it was "not illegal to apply" for the loan. *See* Mtn. to Dismiss Indictment, at 1–6 (Dckt. No. 27).

Turasky explains that "entities that have ceased normal operations and filed for Subchapter V bankruptcy should be eligible for PPP loans." *See* Motion to Dismiss Indictment, at 5 (Dckt. No. 27). She further explains that "a business applying for the PPP loan need not be operational at the moment it is applying for the loan as long as it was operational on February 15, 2020 which Giffords [sic] was." *Id.* at 3 (citing 15 U.S.C. § 636(a)(F)(ii)(II) ("In evaluating the eligibility of a borrower . . . a lender shall consider whether the borrower was in operation on February 15, 2020.")). As Turasky sees it, she committed no crime because Gifford's was technically "eligible" for the PPP loan. *Id.* at 5–6 ("In determining whether Defendant was eligible for the PPP loan, what should be dispositive is not whether the business was operational at the time when the application was filed but whether there was an intent to reopen the business.").

This argument is misplaced. It may be true that bankrupt entities remain eligible for PPP loans under the CARES Act. The indictment, however, does not charge Turasky with violating that Act.

The alleged crime is not that her business was ineligible for PPP funds. Instead, the alleged crime is that she lied to her PPP lender in her application in order to secure the funds. The crime is bank fraud.

Gifford's may have been eligible for a PPP loan as of February 15, 2020. But mere eligibility on day one does not preclude liability for making false statements in a PPP application at a later date. As the government explains, being in operation on February 15, 2020 does not "guarantee[] the legality of Gifford's PPP application, freeing defendant from her obligations to

11

provide truthful information and certifications in her PPP application." *See* Gov't Resp., at 11 (Dckt. No. 34).

By way of analogy, imagine if someone was eligible for food stamps because they were broke on January 1, 2022. And then, imagine if that person won the Mega Millions lottery on March 1, 2022. And a month later, when taking a break from counting the big pile of money, the person applied for food stamps and certified that he or she was broke. The fact that the person was broke at the beginning of the year wouldn't get that person very far, because he or she was flush with cash at the time of the application.

So too here. Running a business that was operational as of February 15, 2020 was a necessary condition for getting a loan. But it was not a sufficient condition. An applicant also had to make certain certifications. One of those certifications involved the fact that the business had "ongoing operations" as of the date of the application. Another certification involved the anticipated use of funds.

Eligibility as of February 15, 2020 was necessary, but it was not enough. And eligibility as of February 15, 2020 did not give applicants a license to misrepresent the status of their businesses at a later time. Applicants had a duty to tell the truth to the banks about the current status of their businesses on the day of the applications. And that's not what happened here (according to the government). The indictment alleges that Turasky misrepresented the status of her business as of April 10, 2020.

Even an eligible business needs to truthfully make the good faith certifications under section 636(a)(36)(G)(i). *See In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1259 (11th Cir. 2020) ("The text and structure of the statute distinguish 'certifications' from discussions of 'eligibility.' The text of the subsection itself presumes that an 'eligible recipient'

12

is making the certifications.") (citation omitted). The statute required Turasky to confirm that the requested funds were necessary "to support the ongoing operations" of the restaurant, and that the business would use the funds "to retain workers and maintain payroll or make mortgage payments, and utility payments." *See* 15 U.S.C. § 636(a)(36)(G)(i)(I)–(II). The indictment alleges that Turasky lied on both accounts.

To the extent that Turasky attacks the sufficiency of the government's evidence, Turasky needs to keep her powder dry. That battle is reserved for a later day, meaning trial. *See United States v. Bibbs*, 2016 WL 4701441, at *3 (N.D. Ill. 2016); *see also White*, 610 F.3d at 959 ("[W]e do not consider whether any of the charges have been established by evidence or whether the government can ultimately prove its case."); *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) ("A motion to dismiss is not intended to be a summary trial of the evidence. Such a motion is directed only to the validity of the indictment or the information, and it tests only whether an offense has been sufficiently charged.") (quotation marks and citation omitted).

Turasky argues that the evidence (specifically, an email from her husband asking for a loan to purchase back the restaurant's building) shows that she had every intent to keep the business running. *See* Motion to Dismiss Indictment, at 4 (Dckt. No. 27) ("Giffords [sic] had intention on [sic] staying in business through Covid and that Defendant was hopeful that the building could be repossessed and rent owed paid as soon as possible . . . .").

Maybe so. But that evidence is for the jury to weigh at a later date. It is not a basis for challenging the sufficiency of an indictment. *See Firtash*, 392 F. Supp. 3d at 885 ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal."). The strengths and weaknesses of the evidence come later.

Turasky's motion to dismiss Count I is denied.

**II.     Making a False Statement to a Financial Institution (Count II)**

Count II charges Turasky with making a false statement to a financial institution in violation of 18 U.S.C. § 1014. Once again, the indictment is sufficient.

Section 1014 criminalizes "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action" of an FDIC insured bank "upon any application, advance . . . commitment, or loan." *United States v. Lane*, 323 F.3d 568, 583 (7th Cir. 2003) (citing 18 U.S.C. § 1014). To prove a violation under section 1014, the government must establish that: (1) defendant made a false statement to a bank; (2) defendant knew the statement was false at the time she made it; (3) defendant made the statement to influence the action of the bank in granting the loan; and (4) the accounts of the bank were FDIC insured. *See United States v. Thompson*, 2022 WL 1908896, at *6 (N.D. Ill. 2022) (citing *Lane*, 323 F.3d at 580); *see also* Seventh Circuit Pattern Jury Instructions § 1014, at 470.

Like Count I, Count II of the indictment tracks the language of the statute and lists each element of the crime. It alleges that Turasky "knowingly caused false statements to be made to Bank A," an FDIC insured bank, "with the intent to influence the actions of Bank A" concerning her PPP loan application. *See* Indictment, at 6 (Dckt. No. 1). Those knowingly false statements included that the loan was necessary to support the restaurant's "ongoing operations," and that the loan funds would be used for permissible purposes, such as retaining workers or making mortgage interest payments. *Id.*

Although Count II is brief on supporting facts, the Court concludes that its allegations are sufficient. Count II contains all of the elements of the charge, and alleges specific facts that support the false statements. In doing so, the indictment accomplishes its three functions. It has (1) "set out each of the elements of the crime charged," (2) "provide[d] adequate notice of the

nature of the charge so that the accused may prepare a defense," and (3) "allow[ed] the defendant to raise the judgment as a bar to future prosecutions for the same offense." *United States v. Barrios-Ramos*, 732 F. App'x 457, 459 (7th Cir. 2018). Nothing more is required.

Once more, Turasky takes issue with the evidence of her intent. *See* Mtn. to Dismiss Indictment, at 7 (Dckt. No. 27) ("[T]he intent was to continue with the business. . . . [T]he intent to use the money for permissible purposes should not be in dispute."). That's an argument for the jury at trial, not the Court on a motion to dismiss.

Turasky's motion to dismiss Count II is denied.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss the indictment is denied.

Date: March 6, 2023

Steven C. Seeger
United States District Judge

15